# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 45499

| | | |
|---|---|---|
| STEVEN L. PICATTI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | Boise, January 2019 Term |
| v. | ) | |
| | ) | Opinion Filed: September 10, |
| AARON MINER and DENNIS LAURENCE, | ) | 2019 |
| | ) | |
| Defendants-Respondents, | ) | Karel A. Lehrman, Clerk |
| | ) | |
| and | ) | SUBSTITUTE OPINION. THE |
| | ) | OPINION PREVIOUSLY |
| MARK WILLIAMSON, RANDALL | ) | RELEASED ON JUNE 7, 2019 IS |
| GOODSPEED, and JOHN DOES 1-5, | ) | HEREBY WITHDRAWN. |
| | ) | |
| Defendants. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Jason D. Scott, District Judge.

The district court's order granting summary judgment is <u>affirmed in part and vacated in part</u>.

Johnson & Monteleone, LLP, Boise, for appellant. Bruce S. Bistline argued.

Jan M. Bennetts, Ada County Prosecuting Attorney, Boise, for respondent. Erica White argued.

_____

BRODY, Justice.

This appeal arises from the district court's decision to bar Steven Picatti's 42 U.S.C. section 1983 claims against two deputies on the basis of collateral estoppel. On July 12, 2014, Picatti struggled to drive home because road access was blocked for the Eagle Fun Days parade. After circumventing some orange barricades, Picatti drove toward two uniformed deputies who were on foot patrol by a crosswalk, which was marked with a large sign reading: "road closed to thru traffic." The factual background from that point becomes heavily disputed.

Picatti alleges that Deputy Miner hit the hood of his car, then pulled Picatti out of his truck to tase and arrest him. The deputies contend that Picatti "bumped" Deputy Miner with his

1

truck and then resisted arrest, forcing them to tase him into submission. Picatti was ultimately arrested on two charges: resisting and obstructing officers (I.C. § 18-705), and aggravated battery on law enforcement (I.C. § 18-915(3)). At the conclusion of the preliminary hearing, Picatti was bound over. Prior to trial, Picatti accepted a plea agreement in which he pleaded guilty to disturbing the peace (I.C. § 18-6409) for "failing to obey a traffic sign and driving into a restricted pedestrian area." The court entered a judgment of conviction, which has not been appealed, overturned, or expunged.

Two years later, Picatti brought a 42 U.S.C. section 1983 suit against his arresting deputies, claiming deprivations of his protected rights to be free from (1) unreasonable seizure, (2) excessive force, and (3) felony arrest without probable cause. The district court granted summary judgment to the defending deputies holding that collateral estoppel barred Picatti from relitigating probable cause once it was determined at the preliminary hearing. Picatti timely appealed. We affirm the order granting summary judgment to the deputies as to Picatti's claims of false arrest and unreasonable seizure; however, we vacate the summary judgment as to Picatti's excessive force claim. The district court correctly applied the doctrine of collateral estoppel to Picatti's claims of false arrest and unreasonable seizure, but not as to excessive force. In addition, we cannot find as a matter of law that the deputies are entitled to qualified immunity on Picatti's excessive force claim when there is a genuine issue of material fact.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of July 12, 2014, Steven Picatti drove west on Highway 44 through Eagle, Idaho, on his way home. Because the community was celebrating the Eagle Fun Days festival, a parade blocked access to Picatti's residence. With several access points closed, Picatti drove his vehicle around orange barrel barricades toward a pedestrian crosswalk where two uniformed deputies were on foot patrol. The crosswalk was blocked by a sign marked "road closed to thru traffic."

Picatti alleges that he approached one officer in his vehicle to ask for directions home. Deputy Miner then advanced towards the vehicle and slammed his hands onto the hood. Miner was agitated and yelling at Picatti, but Picatti could not hear Miner's shouts over the noisy engine. Picatti contends Miner went to the driver's door, opened it, and "grabbed [Picatti] around the neck." Picatti said he could not exit the vehicle because his seatbelt was on, and he was afraid to remove his hands from the steering wheel. He repeated the words "seat belt" to Miner several

times. Miner then reached across Picatti to unlatch the seatbelt. Miner and another officer, Deputy Laurence, then pulled Picatti out of the vehicle, and pushed Picatti to the ground in an effort to arrest him. Picatti said he struggled simply to get off the hot pavement and claims he could not breathe as the deputies pushed him against the ground. He also claims that the deputies never gave him any instructions, commands, or explanations as they wrestled him from his truck to the ground. After multiple attempts to push himself off the ground, Picatti was tased in the back and handcuffed.

Miner, however, alleges that Picatti did not slow his truck down as he came around the barricades, nor did it appear that he would stop the vehicle. Laurence even began unholstering his gun out of concern Picatti would not stop the truck. Miner pushed through some pedestrians to place himself in front of the crosswalk, and ordered Picatti to stop the vehicle. The truck slowed down but physically pushed Miner back into the crosswalk before stopping. Miner claimed that Picatti looked frustrated and gestured at him with his hands. Miner slammed his hand on the hood of Picatti's truck. The truck then "jerked" forward and hit Miner a second time. Miner walked over to the driver's door, opened it, and ordered Picatti to exit the vehicle. Picatti refused. Miner released Picatti's seatbelt, then he and Laurence pulled Picatti out of the truck. As the three men struggled against one another, Picatti and the deputies went to the ground.

Officer Goodspeed also came to assist in subduing and arresting Picatti. Goodspeed noted that Picatti was "very fit" despite being seventy years old, and struggled against the officers as they tried to handcuff him. Miner contends that Picatti refused to put his hands behind his back, and instead continually tried to get up. During the struggle, Laurence also felt someone tugging on his gun and yelled out, "get your hands off my gun." Once Laurence could see his weapon, he saw that Picatti's hand had become trapped between Laurence's gun and holster; Picatti's "wild" arm movements tugged at the holster even though he did not reach for the weapon. Upon hearing Laurence's shout, however, Miner tased Picatti to quickly quell the struggle. Both Laurence and Goodspeed were also shocked by the taser wires. Finally subdued, the deputies handcuffed Picatti. Deputy Williamson then transported Picatti to the Ada County Jail on a misdemeanor charge of resisting and obstructing officers (I.C. § 18-705), as well as a felony charge for aggravated battery on law enforcement (I.C. § 18-915(3)).

On August 20, 2014, Picatti appeared before a judge for a preliminary hearing. Picatti and Miner were the only witnesses at the hearing, and both testified. Picatti's attorney cross

3

examined Miner at length, and questioned Picatti as well. At the hearing's conclusion, the court determined there was probable cause to bind Picatti over to the district court on the felony charge, and sufficient cause to believe he was guilty of both charges. The magistrate court explained that Picatti's vehicle came into contact with Miner, with Picatti knowing that Miner was a deputy.

Prior to trial, Picatti reached a plea agreement, in which he pleaded guilty to disturbing the peace (I.C. § 18-6409) for "failing to obey a traffic sign and driving into a restricted pedestrian area." The court entered a judgment of conviction, which has not been appealed or overturned.

Almost two years later, Picatti filed a civil suit against Miner and Laurence, asserting under 42 U.S.C. section 1983 a deprivation of his protected right to be free from (1) unreasonable seizure, (2) excessive force, and (3) felony arrest without probable cause. While the initial complaint asserted claims against four defendants—Miner, Laurence, Goodspeed, and Deputy Mark Williamson—the court dismissed the claims against Williamson and awarded summary judgment to Goodspeed. Only Miner and Laurence remain as defendants.

On July 17, 2017, the deputies filed a motion for summary judgment, arguing in their memorandum that Picatti's claims were barred by collateral estoppel because the criminal court adjudicated and found probable cause for his arrest. Picatti then filed a Memorandum in Opposition to Defendant's Motion for Summary Judgment, asserting there was no probable cause determination to his claim, nor was there full and fair litigation on the issue of probable cause. After evaluating the parties' claims, the district court granted the deputies' motion for summary judgement on the basis of collateral estoppel—namely, that the August 20, 2014 hearing barred Picatti's civil claim because the earlier criminal proceedings established probable cause for the arrest. The court explained that Picatti's excessive-force claim and false-arrest claim would require the court to re-litigate the existence of probable cause. Picatti timely appealed to this Court.

## II.  STANDARD OF REVIEW

Determining whether collateral estoppel bars claims from relitigation is a question of law over which the Court exercises free review. *Rodriguez v. Dep't of Correction*, 136 Idaho 90, 92, 29 P.3d 401, 403 (2001). Likewise, determining whether an officer is entitled to qualified

4

immunity requires de novo review on appeal. *James v. City of Boise*, 160 Idaho 466, 477, 376 P.3d 33, 44 (2016).

## III. ANALYSIS

### A. The district court erred in granting summary judgment to the deputies.

Picatti's claims for false arrest and unreasonable seizure are premised on the assertion that the deputies did not have probable cause to seize him. The magistrate court ruled at a contested hearing that there was probable cause to believe that Picatti was guilty of committing the charges of aggravated battery on an officer and resisting or obstructing officers. Picatti simply cannot relitigate probable cause for his arrest or felony prosecution. In addition, while Picatti's final claim of excessive force was not decided in the prior criminal proceedings—and, consequently, is not precluded by the doctrine of collateral estoppel—we cannot determine whether the deputies are entitled to qualified immunity until the disputed facts are resolved below. Accordingly, collateral estoppel bars Picatti's claims as to the claims for false arrest and unreasonable seizure, but not his claim for excessive force.

#### 1. Picatti's claims for false arrest and unreasonable seizure are barred by the doctrine of collateral estoppel.

Picatti argues that the preliminary hearing cannot collaterally estop his civil claims because the lower standard of proof in a preliminary hearing should not bar relitigation of the issue of probable cause. He also argues that the possibility Miner lied in the preliminary hearing should permit a new determination on the existence of probable cause. However, Picatti's arguments miss the mark on the collateral estoppel inquiry—the question is whether Picatti fully and fairly litigated the issue of probable cause before the magistrate court, and was fully incentivized to contest probable cause because of the significance of the preliminary hearing.

Collateral estoppel stems from the doctrine of res judicata, and establishes a legal barrier against the relitigation of an identical issue with the same party or its privy. *Rodriguez v. Dep't of Correction*, 136 Idaho 90, 92, 29 P.3d 401, 403 (2001); *Anderson v. City of Pocatello*, 112 Idaho 176, 183, 731 P.2d 171, 178 (1986). This doctrine, also known as issue preclusion, prevents a party from resurrecting a lawsuit already put to rest; it protects litigants from unnecessary costs and promotes judicial economy from needless and likely inconsistent adjudications. *Berkshire Investments, LLC v. Taylor*, 153 Idaho 73, 81, 278 P.3d 943, 951 (2012); *Pines, Inc. v. Bossingham*, 131 Idaho 714, 717, 963 P.2d 397, 400 (Ct. App. 1998).

5

This Court established five factors that must be evident for collateral estoppel to bar the relitigation of an issue determined in a prior proceeding:

> (1) the party against whom the earlier decision was asserted had a full and fair opportunity to litigate the issue decided in the earlier case; (2) the issue decided in the prior litigation was identical to the issue presented in the present action; (3) the issue sought to be precluded was actually decided in the prior litigation; (4) there was a final judgment on the merits in the prior litigation; and (5) the party against whom the issue is asserted was a party or in privity with a party to the litigation.

*Rodriguez*, 136 Idaho at 93, 29 P.3d at 404. Accordingly, a prior criminal proceeding may bar a plaintiff from relitigating the same issue in a subsequent civil action, including suits brought under 42 U.S.C. section 1983. *See, e.g., Anderson*, 112 Idaho at 176, 731 P.2d at 171.

The United States Supreme Court has continually recognized that 42 U.S.C. section 1983 "creates a species of tort liability." *Heck v. Humphrey*, 512 U.S. 477, 483 (1994). The statute specifically provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. This provision "supplies a remedy for the deprivation under color of state law of federally protected rights." *James v. City of Boise*, 160 Idaho 466, 473, 376 P.3d 33, 40 (2016). Thus a police officer could be found liable for damages under 42 U.S.C. section 1983 where he infringed on the plaintiff's federally protected rights, such as using unreasonable force in effecting an arrest. *See Sprague v. City of Burley*, 109 Idaho 656, 664, 710 P.2d 566, 574 (1985).

Generally, civil tort actions remain inappropriate vehicles to challenge the validity of criminal judgments—concerns for finality and consistency have invariably restricted opportunities for collateral attacks. *Heck*, 512 U.S. at 484–86. In *Heck v. Humphrey*, the U.S. Supreme Court explained that where a section 1983 action would render a criminal sentence or conviction invalid, a plaintiff must prove the criminal adjudication "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such

6

determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. at 487. "A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983." *Id.* at 487. Likewise, even where a section 1983 action "does not seek damages directly attributable to conviction or confinement but whose successful prosecution would necessarily imply that the plaintiff's criminal conviction was wrongful" would require the plaintiff to negate an element of the offense for which he has been convicted. *Id.* at 487 n.6. This category would include the situation where a plaintiff resisted arrest and then brought a section 1983 action against a police officer for a violation of his Fourth Amendment right to be free from unreasonable seizures. *Id.*

The key inquiry, the Court explained, is to "consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. If it would so imply, the complaint must be dismissed until the plaintiff proves the criminal adjudication was invalidated; if it would not imply invalidity, the civil action should proceed. *Id.* For example, in the Ninth Circuit Court of Appeals's case *Smithart v. Towery*, Smithart brought a section 1983 claim against his arresting police officers, claiming they "used force far greater than that required for his arrest and out of proportion to the threat which he posed to [them]." 79 F.3d 951, 952 (9th Cir. 1996). "Because a successful section 1983 action for excessive force would not necessarily imply the invalidity of Smithart's arrest or conviction," his claim against the officers was not precluded by *Heck* even though he failed to show a reversal, expungement, or other invalidation of his prior conviction. *Id.* at 952–53.

Two Idaho cases demonstrate how a preliminary hearing affects the collateral estoppel factors in a 42 U.S.C. section 1983 claim. First, in *State v. Gusman*, police arrested a driver for driving under the influence, among other charges. 125 Idaho 805, 806, 874 P.2d 1112, 1113 (1994). At the time of Gusman's arrest, the officer on the scene believed that the driver and passenger had switched seats, with Gusman ending up as the passenger. *Id.* Believing Gusman to be the real driver, the officer asked Gusman to take a blood alcohol evidentiary test, which she refused. *Id.* He then seized her license. *Id.* At the license suspension hearing (BAC hearing), Gusman—the only witness—showed the court evidence she was not operating the vehicle on the night in question, and the court determined there was no evidence the officer had reasonable grounds or probable cause to believe she was the driver. *Id.* Gusman then raised this BAC-hearing finding during her DUI criminal prosecution as a basis to dismiss the charges, but the

court declined to apply collateral estoppel. *Id.* at 807. As a result, Gusman pleaded guilty to both driving under the influence and obstructing an officer to drop the remaining charges against her, and then appealed. *Id.* This Court ultimately affirmed the district court's decision to not apply collateral estoppel. *Id.*

This Court explained in *Gusman* that the BAC hearing was litigated to a final judgment, but the State did not have a full and fair opportunity to litigate because it had no incentive to vigorously litigate the license suspension. *Id.* at 808. Such a hearing, this Court explained, was just a minor civil matter pursued by the driver, who had the burden to show why she did not submit to an evidentiary test. *Id.* Allowing collateral estoppel to apply would have turned the BAC hearing into a criminal matter, and forced the state to aggressively litigate future BAC hearings to prevent issue preclusion in subsequent criminal prosecutions. *Id.* at 808–09. In addition, this Court held that the issues were not identical: "the only issues decided at the BAC hearing and the only issue entitled to preclusive effect is that the officer did not have probable cause to request Gusman to submit to the evidentiary test." *Id.* at 809. Because that issue was not present in the DUI prosecution, the ultimate issues of fact were not identical, nor were they barred by collateral estoppel. *Id.*

Second, in *Anderson v. City of Pocatello*, a plaintiff was acquitted of aggravated assault upon police officers, but criminally convicted of "intentionally, without malice" aiming a firearm at others. 112 Idaho 176, 179, 731 P.2d 171, 174 (1986). The police had been investigating the vandalism of an apartment when Anderson emerged from his neighboring apartment with a loaded shotgun. *Id.* The remaining facts were widely disputed. *Id.* Anderson alleged that he never aimed a gun at anyone—and in fact, did not know the men were police officers—while the defendants said Anderson pointed a gun at them after running out of his apartment, forcing them to fire their own weapons. *Id.* Anderson was shot three times before being arrested for aggravated assault on officers. *Id.* He later brought a 42 U.S.C. section 1983 claim against the arresting officers. The district court granted summary judgment to the officers, determining that there was no factual dispute over whether the officers acted on reasonable grounds. *Id.* at 181.

This Court held that Anderson was estopped from denying he had pointed the gun at the officers because that fact was established by the earlier conviction. *Id.* at 180. Nevertheless, this Court reversed the district court's grant of summary judgment because the criminal trial did not adjudicate whether the officers acted on reasonable grounds. *Id.* "Because the evidence renders

8

conflicting inferences, a genuine issue of material fact remains as to whether the officers acted with a good faith belief based upon *reasonable grounds* that the measures they took were necessary." *Id.* (emphasis in original). Doubts remained over whether the officers had reasonable grounds to fire at Anderson—doubts that had to be resolved against the moving party in summary judgment. *Id.* While *Anderson* specifically addressed whether collateral estoppel barred a section 1983 claim following a criminal conviction, its principle applies to collateral estoppel questions in general because issue preclusion "works to prevent the relitigation of issues of ultimate fact." *Gusman*, 125 Idaho at 808, 874 P.2d at 1115. Indeed, the exact rule held in *Anderson* stated: "collateral estoppel bars the relitigation of an issue determined in a criminal *proceeding* in which the party sought to be estopped had a full and fair opportunity to litigate that issue." 112 Idaho at 184, 731 P.2d at 179 (emphasis added).

We also find our sister jurisdiction's case law on this issue persuasive. In *Haupt v. Dillard*, the U.S. Ninth Circuit Court of Appeals examined whether the finding of probable cause in the preliminary hearing barred its relitigation in the defendant's later section 1983 claim. 17 F.3d 285, 288–89 (9th Cir. 1994), *as amended* (Apr. 15, 1994). In *Haupt*, the defendant had been arrested and prosecuted for the charges of kidnapping and murdering a seven-year-old boy. *Id.* at 286–87. While the preliminary hearing established probable cause to arrest the defendant, the jury ultimately acquitted him of all charges. *Id.* at 287–88. The defendant then brought a 42 U.S.C. section 1983 action against the police detectives that arrested him, arguing the officers secured an arrest warrant with an affidavit they knew contained false statements and omitted facts showing Haupt's innocence. *Id.* at 287–88.

The Ninth Circuit applied Nevada law, which "estopped [a litigant] from raising an issue in a subsequent proceeding if (1) the issue was actually litigated and necessarily determined in the prior proceeding, and (2) the parties in the two proceedings were the same or in privity." *Id.* at 288 (citations omitted). The court held that the probable cause determination at Haupt's preliminary hearing was "a final, conclusive determination of the issue" and "sufficiently conclusive of the issue to preclude its relitigation." *Id.* at 288–89. Furthermore, while the court recognized that some defendants may not fully litigate probable cause for tactical reasons—which could, consequently, render collateral estoppel inappropriate—Haupt "vigorously fought the probable cause issue" by pointing out deficiencies in the affidavit and seeking a writ of habeas corpus to overturn the probable cause determination. *Id.* at 289–90.

9

Thus, the court concluded, Haupt could not relitigate the issue of probable cause, and the defendant detectives were immune from suit on charges they violated Haupt's Fourth Amendment right against unreasonable search and seizure. *Id.* at 290.

Read together, *Anderson*, *Gusman,* and *Haupt* demonstrate that courts should focus on what ultimate issues the prior criminal proceeding established, and whether the proceeding was of such significance to incentivize the parties to fully and fairly litigate the issue. *See Anderson*, 112 Idaho at 184–85, 731 P.2d at 179–80; *Gusman*, 125 Idaho at 808–09, 874 P.2d at 1115–16. However, the decision to bind a defendant over for criminal prosecution does not, on its own, invoke collateral estoppel to bar the relitigation of probable cause in a subsequent section 1983 claim. *Haupt,* 17 F.3d at 289–90. Courts must apply a fact intensive inquiry to determine the ultimate issues established by the prior criminal proceeding and whether the proceeding was of such significance to incentivize the parties to fully and fairly litigate the issue. *See Anderson*, 112 Idaho at 184–85, 731 P.2d at 179–80; *Gusman*, 125 Idaho at 808–09, 874 P.2d at 1115–16. For example, in *Gusman* the record showed that the state did not have a full and fair opportunity to litigate because it lacked the incentive to litigate the license suspension. 125 Idaho at 808, 874 P.2d at 1115. Whereas in *Haupt*, the defendant's vigorous attempts to undermine the state's probable cause showing at the preliminary hearing established a full and fair opportunity to litigate the issue. 17 F.3d 285, 289–90. Accordingly, when determining whether collateral estoppel prevents relitigation of an issue determined in a criminal adjudication, Idaho courts must analyze "what the prior judgment decided and the import on the instant civil action of that which was decided at the criminal trial." *Anderson*, 112 Idaho at 185, 731 P.2d at 180 (emphasis omitted).

Therefore, in this case we must look to the collateral estoppel factors and the facts on record to determine whether the preliminary hearing was a final judgment on the merits that provided Picatti with a full and fair opportunity to litigate probable cause.

A "final judgment includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Rodriguez v. Dep't of Correction*, 136 Idaho 90, 94, 29 P.3d 401, 405 (2001) (citation omitted). Tentative decisions will not create a preclusive effect, but a decision can be final for purposes of collateral estoppel where the parties were fully heard, the court supported its decision with a reasoned opinion, and the decision was subject to appeal. *Id.*

10

A probable cause finding in the preliminary hearing to bind a defendant over for trial can be a final judgment on the merits for collateral estoppel purposes. It is a decision where the magistrate examines evidence "to determine whether or not a public offense has been committed and whether or not there is probable or sufficient cause to believe that the defendant committed such public offense." I.C. § 19-804; *see also State v. Stewart*, 149 Idaho 383, 387, 234 P.3d 707, 711 (2010) ("The purpose of the preliminary hearing is to determine whether there is probable cause to believe that the defendant committed a felony."). When a magistrate court finds probable cause, its determination binds the defendant over for trial—this is a firm, conclusive effect that permits the criminal proceeding to move forward. The method to challenge this determination is found in Idaho Code section 19-815A, which provides:

> A defendant once held to answer to a criminal charge under this chapter may challenge the sufficiency of evidence educed at the preliminary examination by a motion to dismiss the commitment, signed by the magistrate, or the information filed by the prosecuting attorney. Such motion to dismiss shall be heard by a district judge.

This process provides a defendant with appellate-like review by a district judge. Other jurisdictions also treat such preliminary hearings as final judgments under the collateral estoppel doctrine. *Autrey v. Stair*, 512 F. App'x 572, 578 (6th Cir. 2013) (recognizing that a finding of probable cause made in the preliminary hearing of a criminal prosecution was a valid, final judgment for collateral estoppel purposes); *Haupt*, 17 F.3d at 288 (holding the probable cause determination in the preliminary hearing was "a final, conclusive determination of the issue."); *Fontana v. City of Auburn*, No. C13-0245-JCC, 2014 WL 4162528, at *7 (W.D. Wash. Aug. 21, 2014), *aff'd in part,* 679 F. App'x 613 (9th Cir. 2017) ("a probable cause determination made at a preliminary hearing is sufficiently firm to satisfy the requirements of the 'final judgment' collateral estoppel requirement."); *Lay v. Pettengill*, 2011 VT 127, ¶ 24, 191 Vt. 141, 155, 38 A.3d 1139, 1148 (2011) (holding the preliminary hearing "was a final judgment on the issue of probable cause"); *McCutchen v. City of Montclair*, 73 Cal. App. 4th 1138, 1145–46, 87 Cal. Rptr. 2d 95, 100 (1999) ("A finding of probable cause to hold the defendant over for trial is a final judgment on the merits for the purposes of collateral estoppel.").

Picatti had a full and fair opportunity to litigate probable cause in his preliminary hearing. As in *Anderson* and *Haupt*, Picatti's criminal proceedings established several facts for probable cause that he cannot relitigate in the civil arena. Though each party presented a different summary of events, the magistrate court noted several facts that led to a finding of probable

11

cause: the deputies were visible and in uniform; Picatti's truck "bumped" Miner after approaching the crosswalk closed to through traffic; and Miner tased Picatti after the deputies forcibly removed him from the truck and they struggled on the pavement. From these facts, the magistrate court reasonably determined that probable cause existed to both arrest Picatti and bind him over for prosecution on the felony charges of aggravated battery on an officer and resisting or obstructing officers after hearing both Picatti and Miner testify.

While Picatti contends he did not have the opportunity to fully litigate probable cause, the record proves otherwise. Picatti vigorously argued against probable cause by cross-examining Miner at length before the magistrate court in an attempt to challenge Miner's factual account and veracity before the magistrate. The hearing was an adversarial proceeding that incentivized each side to litigate the issue of probable cause—the state needed to demonstrate probable cause to move forward with criminal prosecution of the felony charge, while Picatti needed to disprove probable cause to preserve his liberty. Upon hearing each party's full account, the magistrate court found that probable cause existed for both the arrest and to bind Picatti over to the district court for prosecution. Accordingly, Picatti's circumstances meet the collateral estoppel factors and Picatti cannot relitigate probable cause under his false arrest and unreasonable seizure claims.

Picatti also contends that a California district court has carved out exceptions to this collateral estoppel rule by allowing a plaintiff to litigate probable cause in the subsequent civil suit where (1) new or different evidence was available to the judicial officer than was available to the arresting officers, (2) tactical considerations prevented the full and fair litigation of probable cause in the preliminary hearing, or (3) where the plaintiff alleges the arresting officer lied or fabricated evidence. *See Moreno v. Baca*, No. CV 00-7149 ABC (CWX), 2002 WL 338366, at *6 (C.D. Cal. Feb. 25, 2002), *aff'd and remanded*, 431 F.3d 633 (9th Cir. 2005) (affirming other issues; the U.S. Ninth Circuit Court of Appeal did not address the preliminary hearing or collateral estoppel) (internal citations omitted).

Even if we were inclined to adopt these exceptions, Picatti's reliance is misplaced. His factual evidence and testimony remain virtually identical to the presentation at the preliminary hearing before the magistrate court; Picatti's attorney cross-examined Miner at length in the preliminary hearing to undermine a probable cause determination and diminish Miner's veracity;

12

and while Picatti alleges Miner likely lied to the court, he offers no substantial evidence to prove this theory.

Picatti's argument here relies primarily on tenuous authority and the premise that a reasonable juror *could have* concluded Miner was lying about the events leading up to Picatti's arrest. Disputed facts by the parties are not equivalent to proof of misrepresentation, and this Court does not second-guess factual determinations or veracity. It is "the province of the fact-finder to assess the credibility of the witnesses in a state court proceeding." *State v. Perry*, 139 Idaho 520, 526, 81 P.3d 1230, 1236 (2003).

### 2. Picatti's excessive force claim is not barred by collateral estoppel.

The district court determined Picatti could not raise an excessive force claim against the deputies because it would simply relitigate probable cause in a different context. Essentially, because the deputies could arrest him for aggravated battery, Picatti was not free from the forcible removal from his truck. The district court erred in this analysis.

The Fourth Amendment of the U.S. Constitution protects individuals from excessive force by police officers in the course of an arrest, which allows inquiries to be made into whether the officers' actions were objectively reasonable in light of the circumstances confronting them, "without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The calculus of this inquiry, however, "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

As shown in *Smithart v. Towery*, "a successful section 1983 action for excessive force would not necessarily imply the invalidity of [a plaintiff's] arrest or conviction." 79 F.3d 951, 952–53 (9th Cir. 1996). Picatti's excessive force claim does not relitigate the magistrate court's finding of probable cause, nor does it invalidate his conviction. Instead, Picatti is trying to litigate whether the deputies acted reasonably in making the arrest, not whether they had probable cause to seize him. This Fourth Amendment inquiry has yet to be decided in either a criminal or civil court proceeding, so it is not barred by collateral estoppel.

### 3. The trier of fact must resolve the disputed facts before the court can determine whether the deputies are entitled to qualified immunity.

There is a genuine issue of material fact as to whether the deputies violated Picatti's Fourth Amendment right to be free from excessive force, which impedes the Court's ability to

13

address whether the deputies are immune from suit under the doctrine of qualified immunity. Both Picatti and the deputies have presented arguments on qualified immunity that depend on their own version of the arrest. We cannot determine as a matter of law that the deputies are entitled to qualified immunity when that determination depends on unresolved disputed facts. Therefore, we vacate the district court's award of summary judgment to the deputies and remand the case to the district court for the fact-finder to first resolve the genuine issue of material facts so that the court can answer the remaining issue of excessive force and qualified immunity.

Despite the general proposition that excessive force is contrary to the Fourth Amendment, qualified immunity protects officers from the "hazy border between excessive and acceptable force." *Rosenberger v. Kootenai Cnty. Sheriff's Dep't*, 140 Idaho 853, 856–57, 103 P.3d 466, 469–70 (2004) (citation omitted). It is immunity from suit rather than a defense to liability and ensures that officers are on notice that their conduct is unlawful before they are subjected to a lawsuit. *Id.* Thus, "government officials can benefit from qualified immunity in section 1983 suits if they followed a reasonable interpretation of the law," with the objective reasonableness of the action "assessed in light of the legal rules that were clearly established at the time it was taken." *Miller v. Idaho State Patrol*, 150 Idaho 856, 864, 252 P.3d 1274, 1282 (2011) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)); *see also Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (citation omitted).

In *Ashcroft v. al-Kidd*, the U.S. Supreme Court established the two prong analysis required to establish the qualified immunity shield for federal and state officials from money damages: "a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." 563 U.S. 731, 735 (2011). Courts have the discretion to decide which of the two prongs to tackle first, and this Court begins with the second prong to adhere to the principle of avoiding constitutional questions where the case can be decided on other grounds. *James*, 160 Idaho at 473, 376 P.3d at 40.

Normally, qualified immunity is resolved long before trial—"at the earliest possible stage in litigation"—to preserve the doctrine's status as immunity from suit. *Morales v. Fry*, 873 F.3d 817, 822 (9th Cir. 2017) (quoting *Hunter*, 502 U.S. at 227). This early determination is usually

possible because qualified immunity turns on legal determinations rather than disputed facts. *Id.* In fact, qualified immunity is most often a summary judgement vehicle. *Id.* at 823. However, when disputed facts remain, a bifurcation of duties becomes unavoidable: "only the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved." *Id.* Consequently, the trier of fact must resolve the factual disputes before the court can engage in the qualified immunity analysis. *See id.* Indeed, this is an enduring principle of the judicial system: "The controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts." *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935).

For example, in the Ninth Circuit case *Morales v. Fry*, disputed facts about the events that occurred during the plaintiff's arrest barred the appellate court from completing the qualified immunity analysis. 873 F.3d at 825–26. In that case, a woman was arrested during the May 1, 2012 "May Day" protests in Seattle, but the charges against Morales were dismissed as soon as video footage of her arrest went online. *Id.* at 819–20. Morales filed suit against the officer under section 1983. *Id.* At the civil trial, the plaintiff and defendant-officer contested several facts: whether Morales said "Okay, bitch!", whether she punched the officer in the chest, and whether the officer's use of pepper spray was intentional or accidental. *Id.* As the Ninth Circuit court explained:

> Nor can we determine as a matter of law that Morales's constitutional rights were not clearly established. Whether Officer Fry . . . reasonably believed that it was lawful to pull her over the bicycle, depends on disputed factual issues that the jury never resolved in specific interrogatories, including whether Morales said "Okay, bitch!" and whether she punched Officer Fry.

*Morales*, 873 F.3d at 826 n.7. As a result, the Ninth Circuit vacated the verdict as to the plaintiff's unlawful arrest and excessive force claims under section 1983, and remanded for a new trial regarding the disputed issues of material fact. *Id.* at 826. Once the jury returned its verdict, the Ninth Circuit instructed, "the ultimate determination of whether Officer Fry violated Morales's clearly established rights is a question reserved for the court." *Id.*

While we have not dealt with qualified immunity in this context before, this bifurcated approach is almost universally agreed upon by the federal appellate courts. *Id.* at 824; *also see, e.g., Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) ("to the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal

question of whether the defendant is entitled to qualified immunity on the facts found by the jury."); *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002) ("the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty."); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) ("the jury was entitled to determine what facts were known to the officers at the time of the arrest" while the "legal conclusions were for the court to make."). In contrast, the Fifth Circuit Court of Appeals ordinarily reserves qualified immunity for the court but permits the jury to determine the objective legal reasonableness of an officer's conduct at trial. *McCoy v. Hernandez*, 203 F.3d 371, 376 (5th Cir. 2000). We find *Morales* and the majority case law persuasive.

The Deputies contend that this bifurcation is unnecessary because Picatti bore the burden to present clearly established law that the use of force was excessive. While plaintiffs bear this burden and must cite to case law to show a clearly established right, *James v. City of Boise*, 160 Idaho 466, 477, 376 P.3d 33, 44 (2016), disputed facts still require a bifurcated adjudication process that lets the jury resolve the factual issues *before* a court addresses the qualified immunity analysis. *See, e.g., Morales v. Fry*, 873 F.3d 817 (9th Cir. 2017). The recent U.S. Supreme Court case of *City of Escondido, Cal. v. Emmons,* 139 S. Ct. 500, 503 (2019), does not alter that analysis, especially because *Emmons* did not contain any disputed facts on appeal.

As recently noted by the U.S. Supreme Court in *Emmons*, specificity is crucial when defining a clearly established right in Fourth Amendment excessive force cases. 139 S. Ct. 500, 503 (2019). In *Emmons*, a defendant brought a 42 U.S.C. section 1983 claim against city police officers for the use of excessive force during his arrest. *Id.* at 502. There were no disputed facts on the record. *Id.* In fact, police body-camera footage documented the officers' actions. *Id.* At the district court, the officers won on summary judgment because the plaintiff failed to show a clearly established right and the court found the officers "acted professionally and respectfully in their encounter." *Id.* On appeal, the Ninth Circuit reversed and remanded for a trial, stating only "The right to be free of excessive force was clearly established at the time of the events in question." *Id.* The U.S. Supreme Court criticized the Ninth Circuit's overgeneralized right because federal law requires a right to be defined with specificity. *Id.* at 503. The Court restated:

> "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual

16

situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue.

. . .

[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."

*Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018)). In other words, courts must look at existing precedent to identify a case where an officer acted under similar circumstances and define the right using the specific circumstances of the case. *See id.* (citing *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018)). As articulated by this Court:

The first component of this analysis is defining the relevant legal rule at stake. The Court should not define the right too generally, as doing so would essentially vitiate the qualified-immunity doctrine. Here, for example, it would not be helpful to simply ask whether police must not execute unreasonable searches or, as Appellants suggest, whether the police can obtain bodily fluid from a person reasonably suspected of driving under the influence. Warrantless blood draws and voluntary urine samples are significantly less intrusive than warrantless forcible catheterizations. *Instead, the question should reflect the factual specifics in this case.*

*James v. City of Boise*, 160 Idaho 466, 473–74, 376 P.3d 33, 40–41 (2016) (emphasis in original).

We cannot articulate a "clearly established" right with specificity until the district court first determines what facts occurred. While the Deputies point to *Emmons* as the basis for a rehearing, *Emmons* did not deal with *any* disputed facts; rather, that case criticized the Ninth Circuit's failure to define a right with specificity. The Deputies are correct that a plaintiff bears the burden of showing a clearly established right to be free from excessive force in the particular circumstances. Nevertheless, we cannot reach that step of the qualified immunity inquiry without first resolving the disputed facts. To accept the Deputies' argument here requires this Court to decide what key facts occurred to define these circumstances, a question reserved for the jury in the bifurcated process outlined in *Morales*. 873 F.3d at 825–26. This Court would be forced to either make factual determinations on appeal or articulate a generalized right, neither of which we can do. *Emmons*, 139 S. Ct. at 503 (2019) ("This Court has repeatedly told courts . . . not to

17

define clearly established law at a high level of generality.") (quoting *Kisela*, 138 S. Ct. at 1152); *Dimick v. Schiedt*, 293 U.S. 474, 486 (1935) ("The controlling distinction between the power of the court and that of the jury is that the former is the power to determine the law and the latter to determine the facts."). Like in *Morales*, this Court has "no way of divining which scenario actually happened" to Picatti, 873 F.3d at 825, and thus, the Court is obliged to remand the case to trial. Unlike *Emmons*, however, the Court remands only to resolve the disputed facts, not to deny the Deputies qualified immunity as they contend.

Generally, federal appellate courts let district courts determine whether to employ a general verdict form or utilize special interrogatories. *See, e.g., Morales*, 873 F.3d at 823; *Cavanaugh v. Woods Cross City*, 718 F.3d 1244, 1256 (10th Cir. 2013). We will give district courts that same discretion. However, we stress the importance of the factfinder's mission to discover the disputed facts that are crucial for a court to make the requisite qualified immunity analysis. In the Fourth Amendment context, specificity of the facts is key, especially since a clearly established right must reflect the factual specifics of the case. *See White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Ashcroft*, 563 U.S. at 742; *James*, 160 Idaho at 473–74, 376 P.3d at 40–41.

Nevertheless, despite the need for a jury in this bifurcated process, the ultimate legal questions of clearly established rights, potential violations of those rights, and entitlement to qualified immunity must remain in the court's sphere as legal conclusions. *See, e.g., Morales*, 873 F.3d at 822–23, 825–26. Cases in multiple circuits of the U.S. Courts of Appeals provide good examples of how a court can use specific interrogatories with the jury to unravel the factual disputes. For instance, in *Curley v. Klem*, a jury trial determined facts on remand after the district court had originally failed to recognize factual disputes in its qualified immunity analysis. 499 F.3d 199, 203–04 (3d Cir. 2007). The Third Circuit recounted:

> In answer to the special interrogatories, the jury found that, when Klem approached the Camry, Bailey's body was on the front seat of the car, not on the floorboards, and that Klem did not look into the window of the car. Furthermore, the jury found that Bailey's body should have been visible to someone standing in Klem's position but that Klem had not made an objectively reasonable effort to look into the Camry. The jury also found that it was objectively reasonable for Klem to believe that the toll collector was signaling to the center of the plaza. Additionally, the jury found that Curley did not repeatedly point his gun at Klem, and that, when Curley was shot, he was not raising his gun to point it at Klem. Finally, the jury could not reach a unanimous decision and so did not answer whether Curley's police uniform was visible to someone in Klem's position or whether it was reasonable for Klem to believe that Curley was in civilian clothing.

18

*Id.* Likewise, the Second Circuit Court of Appeals explained that "special interrogatories in [a] case resolves the difficulty of requiring the jury to decide 'what the facts were that the officer faced or perceived'" so the court can make the ultimate legal determinations. *Stephenson v. Doe*, 332 F.3d 68, 81 (2d Cir. 2003). Or, as articulated by the Eleventh Circuit Court of Appeals:

> Qualified immunity is a legal issue to be decided by the court, and the jury interrogatories should not even mention the term. Instead, the jury interrogatories should be restricted to the who-what-when-where-why type of historical fact issues.

*Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002). In addition, we remind the district courts that for the purposes of qualified immunity, a court must resolve all factual disputes in favor of the party asserting the injury. *Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1064 (9th Cir. 2013).

Like in those federal cases, Picatti and the deputies dispute key facts surrounding the circumstances of Picatti's arrest that prevent us from determining whether there was a clearly established right to be free from excessive force in these circumstances. The qualified immunity doctrine requires a right to be particularized to the facts of the case at hand and not defined "at a high level of generality." *White*, 137 S. Ct. at 552 (quoting *Ashcroft*, 563 U.S. at 742). Because we must define a right with such specificity, we cannot meaningfully characterize the right at issue without a fact-finder first resolving disputed facts. As an appellate court "it is not our role on appeal to retry the case, to weigh the evidence as a trier of the facts or to determine the facts in the case." *Jensen v. Siemsen*, 118 Idaho 1, 6, 794 P.2d 271, 276 (1990).

We will not adopt the role of the trier of fact to resolve these genuine issues of material fact. Instead, we leave these factual questions to the jury to resolve on remand, including, but not limited to, whether Picatti resisted arrest or was simply pushing himself off the pavement, if Miner heard Laurence say "get your hand off my gun," whether Miner asked Picatti to exit the vehicle or immediately grabbed Picatti by the neck to pull him out, and so on. All of these facts contribute to the "totality of the circumstances" and must be established so the court can understand the exact circumstances the deputies faced and whether their conduct violated the Fourth Amendment. *See White*, 137 S. Ct. at 552; *Ashcroft*, 563 U.S. at 736; *James*, 160 Idaho at 473–74, 376 P.3d at 40–41. Once the jury returns its verdict on those historical facts—establishing the who-what-where-when-why details of the arrest—the ultimate determination of

whether the deputies violated Picatti's clearly established right is a question reserved for the court.

**B. The deputies are not entitled to attorney's fees on appeal.**

The deputies argue they are entitled to an award of attorney's fees because Picatti frivolously raised this appeal. Under 42 U.S.C. section 1988(b), the court "may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs," in any action or proceeding under 42 U.S.C. section 1983. The deputies, however, did not prevail on all issues and Picatti's claim was well grounded in fact and law, as demonstrated by the district court's improper determination that his claim of excessive force was barred by the doctrine of collateral estoppel. As such, we decline to award attorney's fees.

## IV. CONCLUSION

In light of the foregoing, we vacate that portion of the judgment of the district court relative to excessive force and qualified immunity. We affirm the judgment as to Picatti's claims of false arrest and unreasonable seizure. We remand for further proceedings consistent with this opinion. We decline to award attorney's fees or costs.

Justices BEVAN, STEGNER and MOELLER CONCUR.

**BURDICK, C.J., specially concurring.**

I write to make sure our decision is not misinterpreted in 99.9 percent of the preliminary hearings that take place.

Because of the very limited nature of the legal standard found in I.R.C.P. 5.1, I view this case as a one off.

In these types of cases we put a citizen in an untenable position – waive or minimally participate in the preliminary hearing and increase jeopardy in the criminal case or try to vindicate your rights by a stout defense in the criminal case and weaken or obliterate your cause of action in a civil proceeding.

If the argument is a person can game both the civil and/or the criminal system, the concept of judicial estoppel can enforce the truth telling work of the criminal and civil judicial system without the citizen's rights being weakened in both.

Again a waiver of a preliminary hearing cannot support this concept of collateral estoppel nor can the perfunctory recitation of the elements of the charged crime with defense counsel doing their job of probing for weaknesses in the State's case.

Although I am very reticent to join the majority, Justice Brody's careful analysis wins my cautious support. However, I implore trial judges and trial lawyers to be sensitive in these choices.